IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| RICKY KENT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO.: |
| ) | 2:05CV963-D |
| ) | |
| ) | |
| CARRIAGE FUNERAL HOLDINGS, ) | |
| INC.; GREG BRUDNICKI; KENDALL ) | |
| GLOVER; MELVIN PAYNE; ) | |
| W. CLARK HARLOW; et al, ) | |
| ) | |
| ) | |
| Defendants. ) | |
| ) | |

**BRIEF IN SUPPORT OF MOTION TO REMAND**

Plaintiff, Ricky Kent, an Alabama resident, has sued five defendants, including another Alabama resident, Kendall Glover. The action arises from a fraudulent scheme to deprive Kent of the benefit of his bargain under an Asset Purchase Agreement ("Agreement") that he and other partners in Kent-Thornton Funeral Home entered into with Carriage Funeral Holdings, Inc. ("Carriage"), in 1997. On October 6, 2005, Defendants Carriage, Greg Brudnicki, Melvin Payne, and W. Clark Harlow, removed the action to this Court, contending that this Court has jurisdiction based on 28 U.S.C. § 1332, because Defendant Glover has been fraudulently joined.[1]

There is no dispute that the amount in controversy exceeds $75,000, exclusive of interest and costs. There is no dispute that Kent is a resident and citizen of the state of Alabama. There is also

---

[1] Pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, this motion is filed timely within 30 days of the filing of the Notice of Removal. In any event, Plaintiff's grounds for remand relate to this Court's lack of subject matter jurisdiction, which may be raised at any time.

no dispute that Glover is a resident and citizen of the state of Alabama or that he was manager of the funeral home for Carriage from November 1997 through July 1998, and that he continued to work for Carriage through February 1999. (See Declarations of Kendall Glover and Debbie Horton).

The removing Defendants' sole hope for demonstrating a lack of diversity under *Strawbridge v. Curtiss* is their contention that Glover has been fraudulently joined because there is no possibility that Kent can prove a claim against him. Specifically, by way of declarations from Glover and Debbie Horton, Carriage's current payroll manager, the removing Defendants claim that Glover could not have been involved in the wrongdoing alleged in the Complaint because he was no longer employed with Carriage as of February 6, 1999. As demonstrated below, this contention is inaccurate and without merit. Therefore, this Court is without jurisdiction, and this case must be remanded to the Clayton Division of the Circuit Court of Barbour County, Alabama.

## PROCEDURAL AND FACTUAL BACKGROUND

On September 1, 2005, Kent filed in the Clayton Division of the Circuit Court of Barbour County, Alabama, a Complaint alleging claims in connection with the Agreement, which he and other partners in Kent-Thornton Funeral Home ("Kent-Thornton") entered into with Carriage in 1997, whereby Carriage acquired Kent-Thornton's assets. Because Kent-Thornton was a maturing business that had not yet reached its full potential, the parties included a three-year earnout provision, whereby a portion of the purchase price would be calculated based on Kent-Thornton's performance. (Complaint, ¶10; Affidavit of Ricky Kent, attached to Motion to Remand as Exhibit "A", pp. 1-2). The purchase price was to be $1,000,000.00, plus the amount, if any of the Contingent Purchase Price, which was to be calculated based on Carriage's earnings during the fiscal years ending December 31, 1998-2000, which would then be paid in 2001, based on Kent-Thornton's average

gross income during that three-year span, multiplied by seven. (Complaint, ¶ 10, Kent Aff., p.2). Carriage installed Glover as manager of Kent-Thornton as of the date of the purchase. (Complaint, ¶ 12; Kent Aff., p. 2). Carriage, and during the first year, Glover, maintained control of Kent-Thornton's books and accounts for the three-year span covered by the earnout provision. (Kent Aff., p. 2).

In early 2000, Defendants Brudnicki, Payne, Harlow and other agents of Carriage asked the partners of Kent-Thornton to sign an Amendment to the Agreement. (Complaint, ¶ 14). The Amendment stated that Carriage would pay a lump sum of $154,885.00 plus 50% of the amount, if any, by which the three-year earnout exceeded $1,000,000.00. (Complaint, ¶ 14). However, Brudnicki told Kent that Carriage's earnings over the first two years had been greater than anticipated, and Carriage merely wanted to pay half of the three-year earnout money in advance, so that it would not be saddled with the entire payment in a single year. (Complaint, ¶ 14; Kent Aff., p. 2). Although Kent agreed to accept the half-now and half-later arrangement proposed by Carriage's agents, was not aware of the execution of the Amendment to the Agreement and did not sign or authorize anyone to sign on his behalf. (Kent Aff., p. 2)

On or about February 16, 2000, Brudnicki (or some other party unknown to Kent at this time) fraudulently signed Kent's name on the Amendment. (Complaint, ¶ 17, 24). Kent did not learn of the forged signature or other scheme to deprive him of the benefit of his bargain under the original contract until Spring 2005. (Complaint, ¶ 20, Kent Aff., p. 2).

At the end of 2000, Kent received an earnout check from Carriage for less than he had anticipated. (Complaint, ¶ 18). When Kent asked Brudnicki about the reasons for the lower amount, Brudnicki blamed Glover's mismanagement for the discrepancy. (Complaint, ¶ 18). When the same

thing happened at the end of 2001, Brudnicki again blamed Glover's mismanagement of Kent-Thornton, and told him that Glover had made mistakes and/or had fraudulently accounted Carriage's first-year earnings and the three-year average was therefore drastically reduced from the original projection. (Complaint, ¶ 19, Kent Aff., p. 2).

Glover was the manager of Kent-Thornton during the first of the three years of the earnout period set forth in the Agreement. (Complaint, ¶ 13; Kent Aff., p. 2). Although Kent has asked on a number of occasions to inspect Kent-Thornton's books and accounts during the earnout period (including the time during which Glover was manager of Kent-Thornton), such an inspection has yet to be permitted. (Kent Aff., p. 2). Tellingly, at the conclusion of his service with Carriage, it released Glover to obtain employment in a location and doing a job that was contrary to the terms of the non-compete provisions of his employment contract. (Kent Aff., p. 3).

Based on these facts, Kent has alleged that both before and after his departure from Carriage, Glover was aware of and participated in a conspiracy to defraud Kent from the benefit of his bargain under the Agreement through his bookkeeping and accounts of Kent-Thornton during a portion of the earnout period and/or that he participated in a fraud to conceal the truth about Kent-Thornton's bookkeeping and accounts during the earnout period. (Complaint, Counts I, II, VIII, IX, X, XI, XII, XIII, XV; Kent Aff., p. 3). Against Glover, therefore, Kent has alleged claims of fraud and suppression (Count I), conspiracy to commit fraud and suppression (Count II), negligence (Count VIII), wanton fraud and suppression (Count IX), wanton breach of contract (Count X), wanton breach of fiduciary duty (Count XI), wantonness (Count XII), forgery (Count XIII), and conspiracy to commit forgery (Count XV).

**ARGUMENT: GLOVER WAS PROPERLY JOINED AS A DEFENDANT**

**1.      Overview of Fraudulent Joinder**

The removing Defendants' bid for federal jurisdiction rises or falls based on the doctrine of fraudulent joinder. As the Eleventh Circuit has explained, there are three ways in which a removing party may successfully prove fraudulent joinder:

> "Fraudulent joinder is a judicially created doctrine that provides an exception to the requirement of complete diversity. Joinder has been deemed fraudulent in two situations. The first is when there is no possibility that the plaintiff can prove a cause of action against the resident (non-diverse) defendant. Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir.1983), superceded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533 (11th Cir.1993). The second is when there is outright fraud in the plaintiff's pleading of jurisdictional facts. Coker, 709 F.2d at 1440. In Tapscott v. MS Dealer Service Corp., 77 F.3d 1353, 1355 (11th Cir.1996) (abrogated on other grounds in Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir. 2000))], a third situation of fraudulent joinder was identified--i.e., where a diverse defendant is joined with a nondiverse defendant as to whom there is no joint, several or alternative liability and where the claim against the diverse defendant has no real connection to the claim against the nondiverse defendant. Id. at 1360."

Triggs v. John Crump Toyota, Inc., 154 F.3d 1284, 1287-88 (11th Cir. 1998).

In this case, the removing Defendants' suggestion that fraudulent joinder has occurred is based solely on the first type of fraudulent joinder – i.e., that there is no possibility that Kent can prove a cause of action against the non-diverse defendant. Again, the Eleventh Circuit's analysis in Triggs proves helpful:

> "If there is even a possibility that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court. Coker, 709 F.2d at 1440-41 (emphasis added). The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a possibility of stating a valid cause of action in order for the joinder to be legitimate."

Thus, in <u>Triggs</u>, where the plaintiff alleged that the resident defendant operated in concert with the nonresident defendant to defraud him by misrepresenting and suppressing material facts with regard to automobile lease transactions, the Eleventh Circuit summarily found that the complaint stated a potential cause of action against the resident defendant in state court, based on Rule 20 of the Federal Rules of Civil Procedure. As the <u>Triggs</u> court noted, Rule 20 provides that "[a]ll persons ... may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action."

Defendants do not dispute that Glover is, like Kent, a resident and citizen of the State of Alabama. They do not dispute that Glover was manager of Kent-Thornton beginning in November 1997 and that he continued as an employee of Kent-Thornton until his departure in February 1999. Rather, Defendants contend that, because Glover has submitted a declaration stating that (1) he was not employed by Carriage from February 6, 1999, onward and (2) he had no communications with Kent or any of the Defendants since his departure from his employment with Carriage, he could not have been involved, directly or in a conspiratory capacity, with the wrongdoing alleged in the Complaint.

  2.  **The Effect of Defendants' Submitted Declarations**

Recent Eleventh Circuit precedent has clarified the rule with regard to the effect of affidavits (and, presumably, declarations submitted under § 28 U.S.C. § 1746) in the context of a removal based on fraudulent joinder. In <u>Legg v. Wyeth</u>, ___ F.3d ___, 2005 WL 2756717 at *4 (11th Cir. Oct. 25, 2005), the Court of Appeals held that the district court erred in failing to consider affidavits

presented by the defendants in support of their contention that there was no possibility that the plaintiff could prove a cause of action against non-diverse defendants. The Legg Court was quick to point out, however, that such affidavits are effective only insofar as they are undisputed and contradictory of the allegations of the Complaint. Id (quoting Badon v. RJR Nabisco, Inc., 224 F.3d 382, 393-94 (5th Cir. 2000)). Thus, even in the face of affidavits or declarations submitted by removing defendants, remand is nevertheless appropriate where (1) the removing defendants' affidavits or declarations fail to contradict the allegations of the complaint; or (2) the plaintiff presents evidence to dispute the removing defendants' affidavits or declarations. In this instance, remand is warranted on both grounds.

    a.    *The Submitted Declarations Do Not Contradict All Allegations.*

First, the removing Defendants' affidavits fail to contradict material allegations of the Complaint that implicate Glover. The removing Defendants do not deny that Glover breached a legal duty to properly manage the books and accounts of Kent-Thornton during his term as a Kent-Thornton employee from 1997-1999. (See Count VIII). More to the point, the removing Defendants do not deny that such improper accounting and bookkeeping was part of a larger scheme, begun shortly after the Agreement was closed, to deprive Kent and his partners of the benefit of their bargain. This deprivation of funds, rather than merely the Amendment and Kent's forged signature, is the fraudulent scheme at the heart of Kent's Complaint. While Glover denies knowledge of the Amendment or Kent's forged signature, he does not deny knowledge of the ultimate goal to preclude Kent and his partners from getting what they bargained for when they signed the Agreement. The Amendment and its forgery was simply one part of the overall scheme. Under Alabama law, it is not necessary that one actually commit a fraud to be liable for a conspiracy to commit that fraud.

Cf. Ryan v. First Alabama Bank, 620 So.2d 528 (Ala. 1993) (evidence of defendant bank's knowledge that it was accepting money that developer had acquired by fraud precluded summary judgment on civil conspiracy count).

Certainly, Glover cannot disclaim his liability while in Carriage's employ merely by virtue of the agency relationship. As the Alabama Supreme Court has recognized, "the general rule is that officers or employees of a corporation are liable for torts in which they have personally participated, irrespective of whether they were acting in a corporate capacity." Ex parte Charles Bell Pontiac-Buick-Cadillac- GMC, Inc., 496 So.2d 774, 775 (Ala.1986). Furthermore, "a man is personally liable for all torts committed by him, constituting in misfeasance – as fraud, conversion, acts done negligently, etc. – notwithstanding he may have acted as the agent or under the direction of another." Crigler v. Salac, 438 So. 2d 1375, 1380 (Ala. 1983). Federal courts in this district have applied the holdings of Charles Bell and Crigler to reject fraudulent joinder arguments where allegations against an individual resident defendant included such causes of action as claims under the Alabama Extended Manufacturers Liability Doctrine,[2] fraudulent suppression,[3] and fraudulent misrepresentation.[4] In this case, there can be no doubt that Glover may be held personally responsible for his own tortious conduct, regardless of what capacity he was acting at the time that the tort occurred.

---

[2] See Clay v. Brown & Williamson Tobacco Corp., 77 F. Supp. 2d 1220 (M.D. Ala. 1999); Seaborn v. R.J. Reynolds Tobacco, [Case No. 96-T-1540-N, Dec. 30, 1996] 1996 WL 943621 (M.D. Ala. 1996).

[3] See Grace v. Interstate Life & Accident Ins. Co., 916 F. Supp. 1185 (M.D. Ala. 1996).

[4] See Sexton v. The Principal Fin. Group, 920 F. Supp. 169 (M.D. Ala. 1996); Tolbert v. United Ins. Co. of Am., 853 F. Supp. 1374 (M.D. Ala. 1994).

The removing Defendants erroneously assert that the only events that matter in this suit occurred after the conclusion of Glover's tenure with Carriage.[5] However, it must be borne in mind that Glover's stint as manager of Kent-Thornton and his corresponding responsibility for Kent-Thornton's books and accounts, occurred during the first of the three years of the earnout period. Although he may have been gone from Carriage by February 1999, the effect of his bookkeeping and accounting practices were not felt by Kent until the end of 2000. Furthermore, Glover assumes, incorrectly, that he could not be liable for failing, after his time in Carriage's employ, to disclose information he had gained during his employment. That he could not have been a party to the conspiracy, based on the facts set forth in his statement and that of Horton, is simply overreaching.

In sum, the statements submitted deal only with Glover's conduct and communications (or lack thereof) <u>after</u> he left Carriage. But he presents neither evidence nor authority to demonstrate that the alleged conspiracy, or any conspiracy for that matter, necessarily must be restricted to a single act or series of acts occurring over a limited period of time. Although Kent certainly alleges that the fraudulent scheme included the Amendment and the forgery of Kent's signature, the Complaint in no way should be interpreted to exclude Glover's knowledge of, and participation in maintaining, Carriage's books and accounts, where the fraudulent scheme to deprive Kent and his partners of the benefit of their bargain under the Agreement would have begun. To the extent that the allegations of the Complaint implicate Glover for his actions and knowledge gained while employed by Carriage, and to the extent that his duty to disclose such information as had been suppressed and concealed from Kent continued after his employment, Glover cannot avoid liability

---

[5]Kent does not allege, as the removing Defendants assert based on paragraph 24 of the Complaint, that Glover's "mismanagement" occurred in 2000 and 2001, but that Brudnicki's *representations* of the mismanagement occurred in 2000 and 2001. See Complaint, ¶¶ 18-19.

(and the removing Defendants cannot avoid remand) by carefully declaring his lack of conduct after his departure from Carriage.

    b.    *The Submitted Declarations Are Not Undisputed.*

Second, based on the Affidavit of Ricky Kent, the facts stated in the submitted declarations are in dispute. Therefore, a factual issue exists as to whether Kent can prove a cause of action against Glover, and remand is therefore necessary.

The removing Defendants have correctly analogized the court's obligations in reviewing the evidence submitted both for and against removal to the standard of proof exercised by the court in ruling upon a motion for summary judgment. See Legg, supra, at *4 (quoting Crowe v. Coleman, 113 F.3d 1536, 1538 (11th Cir. 1997). Under Alabama law, "a court considering a motion for summary judgment will view the record in light most favorable to the nonmoving party, will accord the nonmoving party all reasonable favorable inferences from the evidence, and will resolve all reasonable doubts against the moving party." Jones v. Alfa Mut. Ins. Co., 875 So. 2d 1189, 1193 (Ala. 2003). Similarly, federal procedural law dictates that in deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The very existence of a civil conspiracy, under Alabama law, may be established by circumstantial evidence and inferences based on the relationship of the parties. Berryhill v. Barnett, 590 So.2d 343, 344 (Ala. Civ. App. 1991). This is the well established rule in this State for more than fifty years:

> "Concededly there was no positive evidence to that effect [i.e., of a conspiracy], but a conspiracy need not alone be established by that character of evidence. Indeed, seldom is such the case. It is only by looking to the conduct of the alleged conspirators during the progress of the conspiracy and the end result achieved that usually such a fact is established. And to that end it is proper to consider evidence extending over a considerable period, both before and after the date of the alleged combination and even after its termination, just so the proof has a tendency to establish the ultimate fact."

Barber v. Stephenson, 260 Ala. 151, 156, 69 So.2d 251, 255 (1954).

Acknowledgment of the need to respect inferential evidence in deciding upon the validity of a civil conspiracy claim is not limited to Alabama's state courts. The same rule has been recognized here:

> "[a] great quantum of detail need not be required to be alleged as to the formation of the conspiracy because of the clandestine nature of the scheme or undertaking engaged in. The existence of the conspiracy must often be inferentially and circumstantially derived from the character of the acts done, the relation of the parties, and other facts and circumstances suggestive of concerted action."

Peters v. Amoco Oil Co., 57 F.Supp.2d 1268, 1284 (M.D. Ala. 1999) (quoting Eidson v. Olin Corp., 527 So.2d 1283, 1285 (Ala.1988)).

Here, as was recognized in Berryhill and Peters, it should come as no surprise that (at least at this early juncture in the litigation) Plaintiff has no *direct* evidence to refute Glover's statement that he did not help prepare, and in fact was unaware of, the Amendment to the Agreement or the forgery of Kent's signature, nor that he was in communication (either directly or indirectly) with the other Defendants at any time after his departure from Carriage. However, Kent has presented evidence that gives rise to a reasonable inference of Glover's participation in the conspiracy, despite his protestations to the contrary.

Consider Kent's inferential evidence. Brudnicki told Kent in February 2000 that Kent-Thornton had been more successful than Carriage would have believed, thus the need for the split payment (and the Amendment). Who had been in charge of the books and accounts, at least during that apparently successful first year? Glover. But later, when Kent did not or would not sign the Amendment, and the split payment was even less than Kent had understood, Brudnicki's original statement of Carriage's wild success had to be amended. Suddenly, according to Brudnicki, it was Glover's fault that the earnout money was not as great as expected.

Consider also Carriage's unwillingness to provide the books and accounts (some of which had been prepared by Glover) for inspection at any time since Kent began to raise questions. Who could refute problems with the bookkeeping or perhaps blow the whistle on discrepancies within Carriage? Glover. And yet, when Glover left Carriage's employ, he did so in what would have been a direct violation of the non-compete provisions of his employment contract. Why? Because Carriage released him from that obligation, an unusual favor to one who had been "demoted" from his managerial position just six months earlier, according to the removing Defendants' submitted declarations. Furthermore, after demoting and then terminating Glover and without a word (according to Glover) passing between them for more than five years, Carriage now provides Glover's defense and he submits a declaration supporting Carriage and its agents.

A reasonable inference, given these facts, is that, despite Glover's assertions, he did participate in a conspiracy to deprive Kent and his partners from the benefit of their bargain under the Agreement: either he did so before he left Carriage by tampering with the books and accounts in a way that Carriage felt it necessary to hide them from Kent, or he did so at and after he left Carriage's employ, when he knew the truth about the scheme to defraud Kent but kept it a secret

based on an arrangement that allowed him to leave Carriage and work in violation of the non-compete provisions of his employment contract. Either way, there is evidence, at least by inference, to refute Glover's asserted lack of involvement in the conspiracy.

      **3.    A Request, in the Alternative, for Additional Discovery.**

Again, the evidence marshaled above is what is within Kent's knowledge at this time, without the benefit of any discovery, and without the opportunity to review the books and accounts that Glover participated in keeping (badly or even fraudulently, according to Brudnicki) during his employment with Carriage. It is understood that lack of subject matter jurisdiction, such as proof of Glover's diversity-bursting actionable conduct entails, may be raised at any time. Plaintiff is convinced that the foregoing constitutes sufficient proof that Glover is a proper party, not one fraudulently joined. If, in the opinion of the Court, the foregoing evidence is not sufficient to warrant an immediate remand, counsel for Kent respectfully requests that this Court allow the issue of remand to be revisited at a later date when Plaintiff has had the opportunity to obtain discovery necessary to demonstrate more directly Glover's participation in the wrongdoing against him.

## CONCLUSION

Based on the foregoing arguments, as well as Plaintiff's arguments and statements made in the Motion to Remand, Kent respectfully requests that this Court remand this case to the Clayton Division of the Circuit Court of Barbour County, Alabama, which properly should have jurisdiction over this case. In the alternative, Plaintiff respectfully requests that this Court hold the issue of remand in abeyance until Plaintiff has had an opportunity to conduct discovery as to Glover's involvement in the scheme against him.

Respectfully submitted this the 7th day of November, 2005.

      /s/ D. Mitchell Henry
D. MITCHELL HENRY (HEN046)
KIMBERLY S. DESHAZO (SHU022)
Attorneys for Counterclaim Defendant
Ricky L. Kent

OF COUNSEL:

WEBSTER, HENRY & LYONS, P.C.
Post Office Box 239
Montgomery, Alabama 36101-0239
Telephone: (334) 264-9472
Facsimile: (334) 264-9599

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing mail on all counsel of record <u>as listed below</u> by placing a copy thereof, in the United States mail, postage prepaid, on this the 7th day of November, 2005:

C. Nelson Gill, Esq.
Copeland, Franco, Screws & Gill, P.A.
P.O. Box 347
Montgomery, AL 36101-0347

      /s/ D. Mitchell Henry
OF COUNSEL